CHURCH v. CHEAPE.

(Circuit Court, S. D. California. November 26, 1894.)

1. OPTION CONTRACT—MODIFICATION—CONSTRUCTION.

Plaintiff gave P. an option on the stock of an irrigation company for $200,000, with a provision that, if paid by a certain time, all water rents due should be included. P. acted for himself and defendant, his interest to be half the profits after defendant had been reimbursed for the price which he was to pay. Afterwards the contract was modified by agreement that $100,000 should be paid at a certain date, and the balance when certain litigation should be concluded. Thereafter, when defendant sent the $100,000 to P. with which to make the first payment, P. secured a

further modification, by plaintiff agreeing to take $90,000 in lieu of the $100,000 which was to have been paid at that time. At the same time P. executed two instruments, one providing that, if he took an interest with defendant in the company, and succeeded in making a certain sale of it, he would pay plaintiff $10,000, otherwise not; the other reciting payment by P. to plaintiff of $90,000, receipt by P. for defendant of the stock of the company, and the agreement by defendant to pay the remaining $100,000, subject to the conditions of the agreement as twice modified between P. and plaintiff. P. accounted to defendant for the $10,000 retained. *Held*, that nothing more was due from defendant to plaintiff on the first payment.

2. SAME—CONDITIONS OF PAYMENT

Under the provision in an option for the purchase of the stock of an irrigation company that the deferred payment should not be made till all the litigation in which the company was concerned was satisfactorily concluded, the burden is on the seller to prosecute the litigation at his own expense.

3. SAME.

Suits between an irrigation company and others, in which it claimed the paramount right to all the waters of a river to the extent of the capacity, which was 1,000 cubic feet, of its canals, cannot be said to have been satisfactorily concluded where the decree gave the company the first 100 feet of the water, and the other parties the next 350 feet, after which there was no limitation on the company's rights, the flow at low water being 300 feet, though during the period of low water the company may not need more than 100 feet, irrigation not being much practiced at that time.

4. CONTRACTS—EVIDENCE.

On issues as to what, if any, contracts were made, the testimony being conflicting, resort must be had to corroborating circumstances and the probabilities of the case.

5. SAME—DEFERRED PAYMENT—ACKNOWLEDGMENT THAT PAYMENTS ARE DUE.

The fact that, after the payment by defendant to plaintiff of all but the deferred payments of $100,000 on a purchase, which the contract stipulated should not be paid till certain litigation should be satisfactorily concluded, defendant gave to plaintiff 25 bonds, on which a third person agreed to loan plaintiff $20,000 for six months, the bonds to be taken by him as payment for the loan if plaintiff so desired, is not an admission that the $100,000 deferred payment was fully due, where plaintiff, on receiving the bonds, indorsed on the contract an acknowledgment that he had received $25,000 as "an additional payment on the $100,000 due when all litigation is ended," and an agreement to accept, at any time within seven months, seventy-five of the bonds "in payment in full for all sums now due or to become due to me in accordance with this agreement."

Action by M. J. Church against George C. Cheape for balance due on contract. Judgment for defendant.

Frank H. Short, Edwin A. Meserve and Groff & Lefroy, for plaintiff.
W. S. Wood and Lamme & Wilde, for defendant.

ROSS, District Judge. It is surprising that the agreement in respect to so large and important a transaction as that involved in this case should have been drafted in such vague and indefinite terms; and the irreconcilable conflict that exists in the testimony devolves upon the court the duty of carefully weighing and considering every circumstance in the case, to the end that the contract of the parties may be truly interpreted, and then enforced as they themselves made it, without regard to the person or persons upon whom the loss or suffering may fall. Neither the great value of the property, as compared

with the price for which the plaintiff sold it, if such disparity exists, nor the large additional investments made by the defendant to secure its advantages, will justify the court in at all departing from what the parties themselves have stipulated.

The case shows the subject of the contract to have been the capital stock, consisting of 5,000 shares of a California corporation called the "Fresno Canal & Irrigation Company," which company claimed, by appropriation, the right to divert, by means of its canals, a large part of the waters of Kings river, in Fresno county, of this state, for sale and distribution for irrigation and other useful purposes. The plaintiff was the owner of the entire capital stock of the corporation, 994 shares of which stood in his own name. The remaining six shares stood in the names of other persons, to enable them to serve as directors of the company, but the plaintiff was the real owner of those shares also. Being such owner, on the 18th day of August, 1886, he gave, in writing, to Dr. E. B. Perrin, of the city of San Francisco, this option:

"San Francisco, August 18th, 1886.

"For and in consideration of the sum of one thousand dollars, to me in hand paid, the receipt of which is hereby acknowledged, I, M. J. Church, president of the Fresno Canal and Irrigation Company, and owner of five thousand shares, which includes all the capital stock of said corporation, do hereby bind myself, my heirs and assigns, to grant to E. B. Perrin the exclusive option to purchase the capital stock of said corporation, including all canals, machinery, books, maps, and property, of every description, belonging to said corporation, and all land and money due the same; the price of said purchase to be two hundred thousand dollars, gold coin. It being understood and agreed that, if the two hundred thousand dollars is paid to me by the 15th day of September next, I am to transfer the above property, including all assessments for water rights and moneys now due or to become due to said corporation by that date; but, if the above sum is not paid before the 1st of December next, then I reserve the right to collect the assessments that may be due on or before that date. In witness, I have hereunto set my hand and seal, this 18th day of August, 1886.                    M. J. Church.

"Witnessed: Robert Perrin."

At the same time the plaintiff signed and presented to Dr. Perrin this statement:

"San Francisco, Aug. 18, 1886.

"The Fresno Canal and Irrigation Company was incorporated under the laws of the state of California on Feby. 16th, 1871. The canals have a capacity of one thousand cubic feet of water per second. Number of cubic feet of water sold, per second, 430; number unsold, 570, which at $800 $\frac{00}{100}$ per foot, the regular price of selling, will bring $456,000. Annual payments due Sept. 1st, about $30,000, which amount will be much greater next year at same time, on water rights already sold. Annual payments that will be due on the entire amount of 1,000 cubic feet, when all is sold, will be about $95,000 annually. There is now due the company on water-right contracts $14,000. Annual payments due for last year, $7,009.85; also due the company, one and ¾ sections of land. There are now pending contracts with J. B. Haggin for forty, and with M. Theodore Kearney for forty-six, cubic feet of water.                    M. J. Church.

"Witnessed: Robert Perrin."

Prior to the giving of the option, Dr. Perrin had met the defendant, Cheape, who is a Scotch gentleman of large means, and had confessedly talked with him with a view to inducing him to make investments in California; and in view of the circumstance that, nearly

two months before the date of the option,—that is to say, on the 23d of June, 1886,—the defendant, Cheape, had appointed a Mr. Cuyler, who is a lawyer residing in the city of Philadelphia, his attorney in fact, for him, and in his name, place, and stead, "to do and perform any and all acts, matters, and things, of every nature and character, related to, connected with, or growing out of, any and all contracts, engagements, or other writings entered into between myself, of the one part, and Edward B. Perrin, of the other part, or in which I may be in any way or manner conjointly interested with the said Edward B. Perrin," and of the further circumstance that between the 18th of August and the 9th of September, 1886, Cuyler, as the attorney of the defendant, Cheape, came to California with respect to the option, I think it does not admit of doubt that, in securing it, Dr. Perrin really acted for himself and the defendant, Cheape, jointly; the interest of Dr. Perrin then being, according to the testimony, one-half of all of the profits that might be made out of the transaction after the reimbursement of the defendant, Cheape, of the purchase price of the property, which he was to pay, together with interest thereon, at the rate of 7 per cent. per annum.

A few months prior to the giving of the option, to wit, on the 26th of April, 1886, the supreme court of California decided, by a vote of four to three of its then justices, that there could be, upon the public lands in California, no valid appropriation of any of the water of a nonnavigable stream as against a lower riparian proprietor thereon, and that such proprietor is entitled to an injunction to prevent the diversion by such appropriator of any part of such water. Lux v. Haggin, 69 Cal. 255, 10 Pac. 674. And at the time of the giving of the option, as also on September 9, 1886, there were pending against the Fresno Canal & Irrigation Company, in the courts of California, a large number of suits contesting the right claimed by it to divert the waters of Kings river. Among those suits, and the most important of them, were: (1) A suit in equity brought in the superior court of Fresno county, by Poly, Heilbron & Co., who claimed to hold a valid contract for the purchase of a rancho called "Laguna de Taché," which rancho borders upon Kings river for about 30 miles, and below the point at which the Fresno Canal & Irrigation Company diverted the water therefrom claimed by it, and by which suit Poly, Heilbron & Co. sought to obtain an injunction preventing that company from diverting any of the water of the river. (2) A suit in equity, brought in the superior court of Fresno county by John Heinlen, as a lower riparian proprietor upon Kings river, to obtain an injunction against the Fresno Canal & Irrigation Company, enjoining it from diverting any of the water of the river. (3) A similar sui by Heinlen, in the superior court of Tulare county. (4) A suit in equity, in the superior court of Tulare county, by the Lower Kings River Ditch Company, claiming, as a prior appropriator to the Fresno Canal & Irrigation Company, the right to divert certain of the waters of Kings river, and seeking an injunction against that company, preventing it from diverting any of the water of the river until the claim of the Lower Kings River Ditch Company should be satisfied. (5) A similar suit, by the Last Chance Water-Ditch Company, in the super-

ior court of Tulare county. And (6) a similar one by the Centerville & Kingsburg Irrigation Ditch Company, in the superior court of Fresno county.

In this condition of affairs, Cuyler, as the attorney and representative of the defendant, Cheape, came to California, with a view to exercise, on behalf of the defendant, the option that had been secured by Dr. Perrin. Cuyler finding that the Fresno Canal & Irrigation Company was in litigation respecting the water claimed by it, there was, on September 9, 1886, made and indorsed on the piece of note paper on which the original option was written this modification:

"The above agreement is modified so that it is agreed that, if one hundred thousand dollars of the above amount be paid by Oct. 25th, all sums now due and to become due by said date shall be paid over. It is also agreed that the remaining one hundred thousand dollars shall not be paid until all of the litigation in which the canal company is concerned is satisfactorily disposed of and concluded. M. J. Church.

"Sept. 9, 1886.

"Witness: Thos. Dewitt Cuyler."

Prior to October 25, 1886, the defendant, who was in Europe, caused to be sent to Dr. Perrin, at San Francisco, $100,000, to be paid to the plaintiff on the contract. Plaintiff went to San Francisco to receive it, and appeared so anxious to get the money that Dr. Perrin saw a chance to induce him to accept a less sum in lieu of that amount. The talk between them in regard to that matter resulted in Dr. Perrin paying to and plaintiff receiving $90,000 in cash, and the execution by plaintiff of the following writing, indorsed upon the paper on which was written the original option and the modification of September 9, 1886, to wit:

"San Francisco, Cala., Oct. 25, 1886.

"This agreement is hereby modified to this extent: In lieu of the $100,-000 $\frac{00}{100}$ to be paid at this date, I agree to take the sum of $90,000 $\frac{00}{100}$, and I agree that this agreement in all respects shall remain in full force and effect. "M. J. Church.

"Witness: M. P. Minor."

—And the execution by Dr. Perrin of the following instrument:

"San Francisco, Cala., Oct. 25, 1886.

"This is to certify that if I take an interest with Capt. George C. Cheape in the Fresno Canal and Irrigation Company's property in Fresno county, California, and succeed in selling whatever bonds may be mine at ninety cents on the dollar, at any time within eighteen months from this date, that at such time I agree to pay to M. J. Church the sum of ten thousand dollars; otherwise not. E. B. Perrin.

"Witness: M. P. Minor."

At the same time, Dr. Perrin executed to the plaintiff this instrument:

"San Francisco, Cala., October 25th, 1886.

"On the payment by me to M. J. Church of ninety thousand dollars, I have this day received for Capt. George C. Cheape certificate No. 81, containing 4,994 shares of the capital stock of the Fresno Canal and Irrigation Company, and the further obligation of M. J. Church to deliver the remaining six shares of the capital stock of said corporation, and that Capt. George C. Cheape has in writing promised to pay the remaining one hundred thousand dollars, subject to the terms and conditions of a written agreement made by M. J. Church, August 18th, 1886, and modified September 9th, 1886, and fur-

ther modified on this 25th day of October, 1886, reference to which is hereby made, as contract between M. J. Church and E. B. Perrin, and made a part thereof.                                                                 E. B. Perrin.

"Witness: M. P. Minor."

The present being an action at law for the balance alleged to be due upon the contract between the plaintiff and defendant, the first question that arises is: What is the legal effect of those proceedings in respect to the first payment? Did they constitute a discharge of that payment, as contended on the part of the defendant, or did they leave $10,000 thereof still due from defendant to plaintiff, as contended on behalf of the latter? If it be conceded that in that matter Dr. Perrin was driving a hard bargain, it does not answer the question. It is but fair, however, to state that his explanation is that he and his brother, Robert Perrin, with whom he consulted respecting the transaction, had become so alarmed in regard to the litigation that his brother wanted him to withhold any payment, but that he concluded to offer the plaintiff $90,000 in lieu of the $100,000, upon the conditions stated, which plaintiff accepted. The testimony is that Dr. Perrin promptly notified defendant's attorney in fact in Philadelphia and his business agent in Europe that he had thus deducted and retained $10,000 of the first payment, and that he accounted to defendant therefor. While this testimony might, under ordinary circumstances, be overcome by the fact that the defendant states in his deposition that he did not know of that deduction until the spring of 1893, it is not so in this case, for it clearly appears that the defendant was a man of large pecuniary affairs, and left the management of his business matters largely to his agents, and, so far as can be gathered from the evidence, paid but little attention to them. The testimony of Dr. Perrin was not only explicit that he did promptly notify Cuyler, as well as the defendant's business agent in Scotland, of his action in respect to the $10,000, but he further testified that his books, in the hands of his secretary then in court, would verify his statement. No attempt was made to show that his testimony in that regard was untrue, and I think the court should accept it as true. As Dr. Perrin's pecuniary interest in the undertaking was in the profits that might arise from it after reimbursement of the defendant of the purchase price of the property, with interest, of course, the less the purchase price of the property, the greater would be his profit. It was no doubt this pecuniary advantage that induced him to endeavor to get the plaintiff to accept, in lieu of the first payment of $100,000, the sum of $90,000. He evidently induced the plaintiff to do so by giving him his (Perrin's) written promise that, if he should take an interest with defendant, Cheape, in the Fresno Canal & Irrigation Company's property in Fresno, and succeeded in selling whatever bonds he should acquire at 90 cents on the dollar at any time within 18 months thereafter, he would at such time pay to the plaintiff $10,000; otherwise not. However hard a bargain this may have been, and notwithstanding the fact that Dr. Perrin already had a contingent interest with the defendant, Cheape, the court, at least in this action at law, is powerless to relieve either party from it. The acceptance by the plaintiff, in lieu of the

$100,000 payment, of $90,000 in cash, with this promise of Dr. Perrin to pay an additional $10,000 upon the conditions stated in the written promise, is inconsistent with the claim now made by plaintiff that he still looked, and had the legal right to look, to the defendant, Cheape, for the remaining $10,000 of the first payment.

The remaining $100,000, it was agreed by the modification of September 9, 1886, should "not be paid until all litigation in which the canal company is concerned is satisfactorily disposed of and concluded." By whom and at whose expense the litigation was to be carried on is not expressly stated, nor is it expressly declared to whom it should be "satisfactorily disposed of and concluded" before the remaining $100,000 should become due.

The complaint contains two counts. In the first it is alleged that the plaintiff sold and delivered to the defendant 4,994 shares of the stock, for the agreed price of $200,000, which the defendant agreed to pay as follows:

"Ninety thousand dollars ($90,000) in cash, which was then paid by the defendant to plaintiff, and the balance of said purchase price, to wit, the sum of one hundred ten thousand dollars ($110,000) as soon as the litigation in which the said corporation was concerned and engaged, in so far as such litigation affected the right of said corporation to divert water from Kings river, was satisfactorily disposed of and concluded."

It is then alleged that thereafter, and **prior to the 1st of January, 1891,** a certain action was brought in the superior court of Fresno county, Cal., by Charlotte F. Clark, as plaintiff, against August Heilbron and others, as defendants, in which action the defendant herein was the person chiefly interested; that, at or about the time of the commencement of that action, the defendant herein agreed with the plaintiff herein that if he (the plaintiff) would pay the sum of $2,000 towards defraying the expenses of the action of Clark v. Heilbron et al., so soon as that action should be disposed of and finally terminated, then, and in that event, the condition upon which the balance of the purchase price of the 4,994 shares of the capital stock of the Fresno Canal & Irrigation Company was made to depend "should be and would be regarded and considered by said defendant [Cheape] as fully performed, and said balance of said purchase price of $110,000 should thereupon become immediately due and payable from the said defendant to said plaintiff"; that the plaintiff, prior to the 1st day of April, 1891, paid said sum of $2,000 towards defraying the expenses of the suit of Charlotte F. Clark v. Heilbron et al., and that that suit was begun, prosecuted, determined, and fully terminated and disposed of on or about the 1st day of April, 1891; that the plaintiff has fully performed all the terms and conditions to be by him kept and performed in the matter of the sale of the stock, and in the matter of the litigation in the first count mentioned; but that the defendant has failed and refused, and still fails and refuses, to pay the balance of the purchase price, except the sum of $25,000, paid thereon on March 25, 1890, and the further sum of $3,000, paid September 25, 1892, etc.

The second count of the complaint alleges that on or about the

25th of October, 1886, the plaintiff sold and delivered to the defendant, at his instance and request, goods, wares, and merchandise, for the agreed price of $200,000, and that defendant paid on account thereof the sum of $90,000; that, by agreement and understanding between plaintiff and defendant, the balance of the purchase price, namely, the sum of $110,000, became due and owing from defendant to plaintiff on or about the 1st day of April, 1891; that the defendant has not made the said deferred payment, or any part thereof, except the sum of $25,000, paid on account thereof on the 25th of March, 1890, and the sum of $3,000, paid on account thereof September 25, 1892; and that the balance, together with interest thereon, remains due and unpaid from defendant to plaintiff.

In support of the second count, it is contended on the part of the plaintiff, first, that under the contract it devolved upon the defendant to dispose of the litigation, and that any unreasonable neglect in the prosecution of it by him entitled the plaintiff to treat the second payment as due, and to bring suit therefor. It is doubtless true that if, by the contract, the burden was cast upon the defendant to prosecute the litigation to a conclusion, the law would not permit him to unreasonably neglect it, and thus defer the payment of money he contracted to pay; but it is not, in my opinion, a fair or reasonable interpretation of the contract to say that the burden was upon the defendant. He was the purchaser, not the seller, of the property. The plaintiff, by virtue of his ownership of all of the stock of the canal company, claimed the right to divert 1,000 cubic feet of the waters of Kings river by means of the canals of the company, and to sell and dispose of it. It was this property, with its incidentals, that he offered and contracted to sell for $200,000, and that the defendant agreed to buy. Surely, neither party contemplated that the defendant was to pay the plaintiff $200,000 unless he got the water. It was the water that he was buying. It was that which constituted the very substance of the contract. It was that only which gave to the property any value. And, as the vendor's right thereto was then clouded by litigation, it was but reasonable and natural that he should undertake to remove the clouds. It would be unreasonable and unnatural to hold, from the language employed, and under the circumstances appearing, that the purchaser assumed that burden. The defendant, through his agents, evidently thought the purchase sufficiently desirable, notwithstanding the litigation, to make a large cash payment; but it was agreed that $100,000 of the purchase money should not be paid until not only the litigation should be ended, but should be "satisfactorily disposed of and concluded." Satisfactory to whom? Manifestly, to the purchaser, to whom was given the right to withhold the deferred payment until that was accomplished. It follows from this construction of the contract that the burden was upon the plaintiff to prosecute and conclude, at his own expense, the litigation in which the canal company was engaged at the time of the making of the contract. That burden, the evidence shows, the plaintiff carried until the latter part of the

year 1890, at which time he refused to pay any other or further expenses of the litigation. If the evidence showed that the defendant in any way prevented the plaintiff from performing the obligation thus assumed by him, it might be held that his non-performance was excused. But the evidence in the case furnishes no just ground for that contention. The defendant did not stand in the way of the prosecution of the suits, or in any way prevent their trial and determination. There is nothing to show that the defendant was not at all times willing that the litigation respecting the property be brought to trial and disposition upon the payment of the expenses thereof by the plaintiff. It is not shown that he, or the company controlled by him, ever refused any request of the plaintiff to bring the cases, or either of them, to trial at plaintiff's expense. To do so at his own expense was not his undertaking, and for that reason, if for no other, no negligence on his part is shown.

It is further contended, in support of the second count of the complaint, that all of the litigation pending at the time of the making of the contract had been, prior to the commencement of this action, practically ended, and should be held by the court to have been "satisfactorily disposed of and concluded." The suit of Poly, Heilbron & Co. against the canal company had been disposed of in the manner hereinafter explained in considering the first count of the complaint. Two of the other pending suits, namely, those brought by the Lower Kings River Ditch Company and the Last Chance Ditch Company against the canal company, were tried in the superior court of Tulare county, and by that court decided in March, 1892. The Lower Kings River Ditch Company alleged in its complaint that it had a canal 32 feet wide, 4 feet deep, and with a grade of 20 inches to the mile. It claimed the right to divert sufficient of the water of Kings river to fill its ditch, except at low water; and during low water it claimed all of the water of the river to the extent of the capacity of its ditch. Besides damages, it asked a perpetual injunction against the defendant, Fresno Canal & Irrigation Company, enjoining that company from diverting the waters of Kings river, or in any manner obstructing or interfering with the free flow thereof, except such surplus water as there might be over and above a sufficient quantity flowing in the river at the mouth of the Lower Kings River Ditch Company's ditch to supply its entire carrying capacity, and to supply all other ditches and all riparian proprietors having rights superior to that company. The result of the trial in that case was a decree of the superior court giving to the Fresno Canal & Irrigation Company the first 100 cubic feet of the low water of Kings river, and giving to the Lower Kings River Ditch Company the next 159 cubic feet of the waters of the river, after which, as against the complainant in the suit, there was no further limitation in respect to the diversion of the waters. One hundred dollars damages, expressly adjudged as nominal damages, were allowed the complainant against the Fresno Canal & Irrigation Company. The Last Chance Ditch Company alleged in its complaint that it had a canal

30 feet wide, 6 feet deep, with a grade of 16 inches to the mile. It asked for an injunction similar to that prayed for in the case of the Lower Kings River Ditch Company, besides $5,000 damages. The result of the trial in the superior court was a decree giving to the Fresno Canal & Irrigation Company the first 100 cubic feet of low water of Kings river, and giving to the complainant in the suit, the Last Chance Ditch Company, the next 190 feet, after which, as against the complainant in the suit, there was no limit respecting the diversion of the waters of the river. One hundred dollars damages, expressly adjudged as nominal damages, were also allowed the complainant in that case against the defendant therein, the Fresno Canal and Irrigation Company.

The plaintiff in the present case contends that the result in those cases was, or should have been, reasonably, if not highly, satisfactory to the Fresno Canal & Irrigation Company. It got, says his counsel, "the first 100 feet of the low water, and then its rivals got the next 349 feet, and after that it was not limited in these suits. Nominal damages only were given against it. Unless it was to have all the water, this should have satisfied it." The evidence shows that at low water Kings river only carries a little over 300 cubic feet of water. The findings of fact in the Last Chance Ditch Company's Case puts it at not exceeding 320 feet. The stream varies greatly at different seasons of the year. Rising in the mountains, and being mainly fed by the melting snow, in the winter its flow is small. When the warm rains begin to fall,—generally about the middle of February, in some seasons as early as the middle of January, and in others not until the end of February,—the water begins to rise. By the 1st of March, generally, the river carries many thousand cubic feet of water, and it increases during the months of April, May, June, and a part of July. It then begins to decrease, going down rapidly. The low-water period commences about the beginning of October, and continues until the commencement of the warm rains, in the early part of the succeeding year. The ordinary irrigation season in that section of the country is from February to September, and in January new land is often irrigated. The bulk of the irrigation, however, is done from April to August, during the period of high water. The contention of plaintiff's counsel that the result reached by the trial court in the suits of Lower Kings River Ditch Company and Last Chance Ditch Company against the canal company should be held to have been satisfactory to the defendant rests largely upon the negative answer given on the trial by the plaintiff to this question:

"If the Fresno Canal and Irrigation Company has the right to take out 100 feet before there is any restriction thereon, and then other parties have a right to take out, in round numbers, 350 feet, and then there is no further restriction, would that restriction of 350 feet at any time when the water is needed interfere with the company taking out water to the extent of the capacity of its canals?"

As has been said, the evidence shows that during low water the entire flow of the stream is but little over 300 cubic feet. According to the decision of the superior court of Tulare county in the

two cases already tried, the Fresno Canal & Irrigation Company is therefore limited during the period of low water to the 100 cubic feet. It is not surprising, therefore, that defendant should be indisposed to regard the result in those cases as a victory for the canal company, claiming the first and paramount right to all of the waters of the river to the extent of the capacity of its canals, and that its counsel should be moving for a new trial of those cases. It is no answer to this to say that, during the period of low water, irrigation is not much practiced, and that during that period the canal company does not need more than 100 cubic feet. That may or may not be so, although it appeared in evidence that during January last the canal company was supplying water for the irrigation of a large body of land, embracing some 60,000 acres. But, without regard to its necessities, the defendant cannot be held bound to accept as satisfactory the result of litigation subjecting a paramount claim of substantial right to the adverse claim of others. Of course, no merely pretended or capricious dissatisfaction on defendant's part would be allowed to avoid payment of the money he contracted to pay. Such dissatisfaction "must be actual, not feigned; real, not merely pretended." ExhaustVentilator Co. v. Chicago, M. & St. P. Ry. Co., 66 Wis. 218, 28 N. W. 343; Gray v. Railroad Co., 11 Hun, 70; McCarren v. McNulty, 7 Gray, 139; Silsby Manuf'g Co. v. Town of Chico, 11 Sawy. 183, 24 Fed. 893; Brown v. Foster, 113 Mass. 136; Zaliski v. Clark, 44 Conn. 218; Gibson v. Cranage, 39 Mich. 49.

The views thus taken in respect to the decisions in the cases of the Lower Kings River Ditch and the Last Chance Ditch Companies against the Fresno Canal & Irrigation Company render it unnecessary to say anything upon this point in regard to the other pending litigation against that company.

The first count of the complaint, as has been seen, sets up that after the making of the original contract, and about the time of the commencement of the action of Charlotte F. Clark v. Poly, Heilbron & Co., the defendant agreed with the plaintiff that if he (plaintiff) would pay $2,000 towards defraying the expenses of that action, upon its termination, the condition upon which the balance of the purchase price of the 4,994 shares of the capital stock of the Fresno Canal & Irrigation Company was made to depend "should be and would be regarded and considered by said defendant as fully performed," and said balance of the purchase price should thereupon become immediately due and payable. The answer puts in issue all of the allegations in respect to that matter, and upon that issue there is much conflict in the evidence.

Poly, Heilbron & Co. were tenants in possession, under one Jeremiah Clark, of the Rancho Laguna de Taché, with a covenant giving them the right to purchase the rancho upon certain conditions. It was under that lease that they had brought the suit against the Fresno Canal & Irrigation Company to enjoin it from diverting any of the water of Kings river. That rancho was of such great value, and was so largely riparian to the river that the suits based upon its riparian rights were regarded by the parties to this action, as

**also by** other appropriators of the waters of Kings river, against whom Poly, Heilbron & Co. also had pending suits for injunctions, as the most formidable obstacle to the asserted rights of the appropriators. Charlotte F. Clark, the widow of Jeremiah Clark, had brought, or was about to bring, suit in one of the courts of the state against Poly, Heilbron & Co. to annul the lease under which they held possession of and claimed the right to purchase the Rancho Laguna de Taché, and to that end had employed, as her attorneys, Messrs. Craig & Meredith, a prominent law firm of the city of San Francisco, under a written contract, which provided that they were to bring and prosecute the suit at their own expense, and for their services were to receive 30 per cent. of what they should recover by the suit over and above the sum which, by the covenant in the lease, Poly, Heilbron & Co. were to pay for the rancho, to wit, $160,000; and Craig & Meredith had, for value received, assigned to Robert Perrin twenty-thirtieths of whatever should inure to them under their contract with Mrs. Clark, and had associated him with them as associate counsel in all proceedings under the contract, agreeing to pay him therefor $2,000, he (Perrin) to pay his own personal expenses. The purpose of the assignment by Craig & Meredith of twenty-thirtieths of whatever fee should inure to them from the suit of Clark v. Poly, Heilbron & Co. to Robert Perrin was to enable him to raise money with which to pay the expenses of that suit, which was expected and proved to be very costly; Perrin representing to Craig & Meredith, and expecting, that he could obtain the money from those appropriators and claimants of the waters of Kings River adversely affected by the riparian claim upon which the suits of Poly, Heilbron & Co. were based. His plan was to ask $1,000 for each thirtieth of the twenty-thirtieths of the Craig & Meredith fee assigned to him, which money should be turned over to them, with which to pay the expenses of the suit of Clark v. Poly, Heilbron & Co.; and, according to all of the evidence in the case, the general plan was to induce the appropriators of the waters to take interests in the Craig & Meredith fee at the rate of $1,000 for each one-thirtieth thereof, by representing to them that the suit of Clark v. Poly, Heilbron & Co. would surely be won by the plaintiff therein, as a result of which the purchasers of interests in the Craig & Meredith fee would get their money back, with some profit, and at the same time work the substitution of Mrs. Clark to whatever rights as riparian proprietors Poly, Heilbron & Co. had to the waters of Kings river, the disposition of whom, according to the assurances of her attorneys, was friendly to the irrigators, and who was willing that the appropriators should divert all of the waters of the river except so much thereof as should be needed for the uses of the rancho. Many of the appropriators and claimants of the waters of Kings river, upon those representations, took interests in the Craig & Meredith fee, paying therefor $1,000 for one-thirtieth thereof, and receiving from Robert Perrin a written assignment of the same. Some of them took two-thirtieths, and one of them (Dr. Perrin, who had, apart from his interest in the canal company, a large quantity of land in the vicinity need-

ing irrigation) took five-thirtieths, at the same rate. But the contention on the part of the plaintiff, Church, is that he did not contribute to the expenses of the suit of Clark *v.* Poly, Heilbron & Co. upon any such basis or understanding; on the contrary, that the distinct agreement between him and Dr. Perrin, acting for the defendant, Cheape, was that, if he (Church) would pay $2,000 towards defraying the expenses of that litigation, then, upon its settlement, the deferred payment for the stock of the canal company should become immediately due and payable from the defendant to the plaintiff.

There can be no doubt, I think, that Dr. Perrin was anxious for the successful consummation of the contract into which he entered on behalf of the defendant with the plaintiff. Indeed, his reward depended upon the success of the undertaking. As has been seen, one of the obstacles, and the principal one, as the parties seemed to think, in the way of that success, was the injunction suit brought by Poly, Heilbron & Co. against the canal company; and, becoming satisfied that the suit of Clark against Poly, Heilbron & Co. would be successful, Dr. Perrin entered into negotiations with Mrs. Clark by which he should have the right to purchase the rancho for a stipulated sum in the event she won her suit, and thus get rid of the injunctions secured by the proprietors of that rancho. In order that the necessary money might be secured for Craig & Meredith with which to prosecute the suit of Clark against Poly, Heilbron & Co., Dr. Perrin, therefore, took an active interest in inducing those adversely affected by the injunctions that had been secured by Poly, Heilbron & Co. to contribute towards the raising of that fund. He first sought the plaintiff, who was one of the pioneer appropriators of water in the district in question, and a man of much influence among the irrigators, to induce him to contribute, not only for the direct benefit to be derived from the money the plaintiff might put into the fund, but also for the indirect benefit of his influence with his neighboring irrigators similarly affected by the injunctions. He sent for the plaintiff to come to San Francisco, and there, at different times, had several interviews with him on the subject. The first is related by the plaintiff as follows:

"He said that he had a scheme by which, if he carried it through, it would settle all the litigation and all the troubles connected with the waters of Kings river, not only with the Fresno Canal Company, but with all other ditch companies: and he said that on the eve of the settlement of the title to the Laguna de Taché Ranch,—a title which Poly-Heilbron set up to it,—on the eve of the settlement of that title, he said he had a pledge from the parties that would obtain the land, a clear title to the land; that he should have it at a stipulated price; and he thought there was a great bargain in it, and he wanted to effect that arrangement. 'And,' says he, 'if you will pay a portion towards defraying the expenses of the lawyers in prosecuting it, if you will pay a portion, or if you will return home, which perhaps will suit you better, and you will go to all these ditch companies: and get them to put up,—just set forth to them what you are going to do, going to take the injunction off of all these ditches,—if this is effected, I will take the land, and the injunction will be set aside, and they will all have water.' 'Now,' says he, 'if you will even go and get them to pay, so that we can prosecute this, and carry it through, and get the title, get a settlement of that case, why,' says he, 'you shall have your money whenever that thing is effected. And,' says he, 'you can well afford to pay a good sum towards prosecuting the suit, and you can

afford to just take your horse and buggy, and go to all these ditch owners and proprietors, and work them into it. And,' says he, 'I have agreed to give fifty thousand dollars, and,' says he, 'it is more than I can pay alone when there is so many parties interested, and especially you. I will make it interesting to you.' He told me before that whenever that suit was settled. that I should get my money. 'But,' says he, 'here is the way now it can be settled.' And I told him I would go and see what I could do. I was interested. Q. At this time, when you were in the city, was anything said in regard to seeing the attorneys representing his interests in that matter? A. Not at that time. I come down again. I went back. Q. Before we leave that, then, was anything further said in this conversation that you have been telling about now,—any more than you have recounted? Was that the substance of all that was said? A. That is the substance of it."

The second interview is thus stated by the plaintiff:

"When I came the second time to Fresno [San Francisco], he wanted I should go down and talk with Craig and Meredith, his attorneys. or Mrs. Clark's attorneys. I went down there, and Perrin introduced me to Craig and Meredith; and Mr. Craig says, 'Yes; this is Mr. Church, is it?' And he says: 'Doctor Perrin has been talking to me about his indebtedness to you, and he wanted I should explain to you the situation of the title.' And he said that Doctor Perrin had told him 'that you was one that ought to pay liberally towards prosecuting that suit, and we have got the suit on hand, and it is as good a suit, and I am just as sure of winning it, as any suit that I ever had; and Mr. Perrin tells me that on the settlement, on their getting this land through Jeremiah Clark,—he had got a proffer, he says, from Mrs. Clark for the land, providing he will defend the title, and carry it through, and get the title embodied in her perfectly,—then he says Mrs. Clark, there is an obligation on her part to deed it to Mr. Perrin upon certain conditions, which he can comply with, and this will settle all litigation. And Mr. Perrin tells me that on the settlement of this, that he will pay you your money.' And Mr. Perrin says: 'That is so. We can pay him his money.' Mr. Perrin then said that it would stop all litigation; it would virtually close out the power of any ditch company on the river,—their doing anything,—from the simple fact,' he says, 'if they come in, which some of them are coming in, (he told me that he had seen Helm), and they are coming in, and we are going to give them, all those that unite in helping to pay this, we are going to give them their water.' And there was some that was going to help in the matter was going to take an interest in the land. And he says: 'They are all going to get their money back,—those that help,—either in money or in land, or get their water.' And he says: 'You shall have your money as soon as the case is settled, and they get a title to the land.' "

While there is much confusion in the testimony of the plaintiff, the gist of it, I think, is that Dr. Perrin agreed that if the plaintiff would help pay the expenses of the Clark-Heilbron suit, and it should be won by Mrs. Clark, and he should acquire the rancho at the price agreed upon between himself and Mrs. Clark, then all litigation in respect to the subject of the contract between plaintiff and defendant should be considered ended, and the deferred payment become immediately due and payable.

The plaintiff's version of the agreement under which he contributed to the expenses of the Clark-Heilbron suit is to some extent corroborated by the witness Helm, who testified that he had conversations with both Dr. Perrin and Robert Perrin in regard to that suit, and, being asked to state what those conversations were, answered:

"Before the suit was commenced, they wanted to raise so much money to prosecute the suit, but when it was I do not know now. It was in regard to this transaction with the Laguna de Taché Rancho. If I could raise so much

money, they could win that suit for Mrs. Clark, and then they would lift the injunctions from our canal. I was interested in a canal out here. And at the same time, if that was done, then they would be in a position to settle with Church,—to pay Church what the canal company was owing to him."

On cross-examination, this witness testified that the principal inducement for his contribution to the fund was to enable Mrs. Clark to prosecute, and, if possible, win her suit, in the hope that upon her success the injunction against the canal in which he was interested would be removed, but that another consideration was, according to his understanding, that the contributors to the fund were to have an interest in any of the excess over $300,000, for which the rancho should be sold.

Both of the Perrins explicitly deny all of the testimony on the part of the plaintiff tending to show that plaintiff contributed to the Clark-Heilbron suit upon the agreement or understanding that, upon its settlement in Mrs. Clark's favor, the litigation referred to in the contract between the plaintiff and defendant should be considered ended, and the deferred payment therein mentioned become due and payable from defendant to plaintiff, or for any different reasons or considerations than applied to and governed the contributions of all other contributors to that fund. And Mr. Craig denied that he had ever said to the plaintiff that Perrin had told him that, on the settlement of the Clark-Heilbron suit, he would pay the plaintiff his money.

In this conflict of testimony, the court must look, in its endeavor to ascertain the truth, to corroborating circumstances, and to the probabilities of the case. The suit of Clark against Poly, Heilbron & Co. was commenced in April, 1887; was tried during the winter of 1888–89; was decided by the trial court in favor of Mrs. Clark, subsequent to which the supreme court of the state interfered with its further progress before the trial judge by writ of prohibition; and the suit was finally compromised and settled in the summer of 1890, one of the essential conditions of the compromise, secured by Dr. Perrin, being that the Rancho Laguna de Taché should be sold to the defendant, Cheape. Towards the expenses of that suit parties interested in irrigation, and injuriously affected by the injunction suits brought by Poly, Heilbron & Co., contributed, at the instance of the Perrins, $20,000. Beyond controversy, one, at least, of the considerations moving each, was the desire to get rid of the injunctions obtained by Poly, Heilbron & Co., and the hope that such aid would bring about that result; and, at least, as to all but two of the contributors to the fund, a further consideration was the assignment by Robert Perrin of one of the twenty-thirtieths of the Craig & Meredith fee for each $1,000 so contributed, under which the contributor hoped, in the event Mrs. Clark should be successful in the suit, to get back the amount of his contribution, with some profit. To one of the ditch companies that contributed $1,000 no interest in the Craig & Meredith fee was assigned, and the plaintiff, Church, testifies that no interest therein was assigned to him in consideration of his contribution to the fund. Robert Perrin's testimony is directly to the contrary. The probabilities that the plaintiff received from

Robert Perrin a similar assignment for the money contributed by him as was received by all of the other contributors to the fund except one would be much stronger but for the fact that at least one ditch company, according to Robert Perrin's own testimony, contributed $1,000, for which it did not receive the assignment of any interest in the Craig & Meredith fee. The plaintiff, Church, contributed $2,000, $400 of which he paid directly to Robert Perrin, and $1,600 to Mr. Meredith, of the firm of Craig & Meredith. Mr. Meredith, who is a very careful man, and a gentleman of the highest character, testified, in substance. that, when the plaintiff paid him the $1,600, he asked him if he thought he would surely get it back, and witness replied he thought he surely would. The evidence shows that the plaintiff, as did many of the other contributors to the expenses of the Clark-Heilbron suit, before agreeing to contribute, consulted with Mr. Craig in regard to the chances of Mrs. Clark winning the suit, and that each of them was assured by him that he considered the case one of the best he had ever had, and that it would surely be won. I regard the remark made by the plaintiff to Meredith when handing him the $1,600 as extremely significant, and as throwing a flood of light on the true consideration of the plaintiff's contribution to the expenses of the Clark-Heilbron suit. It is entirely consistent with the claim on the part of the defendant that for his contribution he acquired an interest in the Craig & Meredith fee, like all of the other contributors, except one of the ditch companies already referred to; it is wholly inconsistent with the claim on the part of the plaintiff that for his contribution he got no interest in the Craig & Meredith fee.

Prior to March 17, 1891, the Fresno Canal & Irrigation Company issued bonds on its property of the face value of $400,000. On that day, in the city of San Francisco, defendant and Dr. Perrin (defendant then being in California) delivered to the plaintiff 25 of the bonds, each of the face value of $1,000, for which plaintiff indorsed upon the original contract as follows:

"This is to certify that I have this day received the sum of twenty-five thousand 00/100 dollars ($25,000 00/100), being an additional payment on the $100,000 00/100 due when all litigation is ended; and I hereby agree to accept at any time in the next seven months seventy-five (75) of the bonds, of one thousand dollars ($1,000) each of the Fresno Canal and Irrigation Company now issued, in payment in full for all sums due or to become due to me in accordance with this agreement.                                    M. J. Church.
"San Francisco, Cala., March 17, 1890.
"Witness: M. P. Minor."

At the same time, Dr. Perrin executed to the plaintiff this instrument:

"San Francisco, March 17, 1890.
"I hereby agree and bind myself, my heirs and assigns, to loan to Mr. M. J. Church within the next ten days twenty thousand dollars for seven months, at six (6) per cent. interest, on the security given to me of (25) twenty-five bonds of the Fresno Canal & Irrigation Company, of one thousand dollars each, as security; and I also bind myself, my heirs and assigns, to take said bonds as payment in full for said loan and interest, provided the said M. J. Church asks or desires me to do so at the expiration of same.
"E. B. Perrin."

And subsequently Dr. Perrin loaned the plaintiff $20,000, taking as security for its repayment the 25 bonds, and thereafter, at plaintiff's request, took the 25 bonds in discharge of the loan.

Counsel for plaintiff contend that this was "a formal admission of the fact" that there was then $100,000 fully due from the defendant to the plaintiff. I am unable to understand how that can be true. At that time not even the suit of Poly, Heilbron & Co. against the Fresno Canal & Irrigation Company had been affected by any disposition of the suit of Clark against Poly, Heilbron & Co., for the latter case was then still pending. Not one of the suits pending against the canal company when the contract was entered into had then been ended; and, even if the agreement under which the plaintiff contributed to the expenses of the Clark-Heilbron suit be as contended by the plaintiff, the payment from defendant to plaintiff had not become due, because that suit was then still pending and undisposed of. It is plain, therefore, that counsel for plaintiff are in error in saying that the bond transaction of March 17, 1890, was an admission by defendant of the fact that the deferred payment was then due from him to plaintiff. To the contrary, the receipt which the plaintiff on March 17, 1890, indorsed on the original contract for the $25,000 in bonds, expressly declared that it was "an additional payment on the hundred thousand dollars due when all litigation is ended." Manifestly, that was a recognition of the fact that the litigation was not then ended. But the recognition did not stop there; it contained the further agreement by plaintiff "to accept at any time within the next seven months seventy-five of the bonds of the Fresno Canal and Irrigation Company now issued, in payment in full for all sums now due or to become due to me in accordance with this agreement." Evidently, both plaintiff and Dr. Perrin then thought the bonds were good, for the latter agreed to accept 75 of them at any time within the next ensuing seven months in full for all sums then due or to become due him under the contract, and Dr. Perrin loaned him $20,000 in gold on the 25 bonds he received on the 17th of March. This transaction, as has been said, is wholly inconsistent with the plaintiff's claim that the deferred payment of $100,000 was then due. The plaintiff, as the evidence shows, was in need of money, and, to get it, was willing to make the agreement in respect to the bonds. It turned out afterwards that the bonds could not be negotiated, although Dr. Perrin went to Europe in the effort to dispose of them, and brought back, at his own expense, an agent of foreign capitalists to investigate them, who, upon the advice of an attorney, based upon the fact of the pending litigation, reported adversely to their purchase. That issue was consequently abandoned.

During all of this time the relations between the plaintiff and defendant and Dr. Perrin continued friendly, and plaintiff continued in the management of the company's business, and to take an active part in the litigation in which it was engaged. In the latter part of 1890 he refused to pay any further expenses of the litigation against the canal company, and then the trouble between the par-

ties began. As early as December 23, 1889, the plaintiff was asking for the balance of the purchase money for the stock, although not even the Clark-Heilbron suit had then been ended. On that day he caused the following letter to be written to Dr. Perrin:

"Fresno, Cal., Dec. 23, 1889.

"Dr. E. B. Perrin—Dear Sir: I am requested by my uncle, M. J. Church, who is himself very busy, to write a few lines to you. He was very much disappointed that he did not get to see you while you were here. He has arrived at a point where he feels justified in calling on you for his money. He has been waiting now for three years, without any interest, and you have had the annual assessment, and sold about two hundred and fifty thousand dollars worth of water rights; and, as the suits are so nearly settled, he now applies to you. He wants the suit set for trial immediately, and pushed to a settlement. Lawyers tell him that he has more than complied with his agreement now, but he is disposed to stand by the company until the last enemy is put down. His interest in the matter would not abate any if he were to get his money now. He has commenced another enterprise that will add to the prosperity of Fresno county, and that you, as well as all other property holders, cannot help but be greatly interested in. To carry out these plans, he must have means, and he is in hopes that you will not deprive him of the use of his money any longer. He has made no demands on you in the past, but has patiently waited until the suits were all practically settled; and he does not propose to stop here, but continue, but must have means to go on with his Sanitarium. The work has been commenced, and it is a reproach on the county to have it stop. When completed, thousands will visit from all over the country, and Fresno will be sought for health, instead of being denounced as a sickly place. M. J. feels that he must have some money in the next few weeks and days if he can get it.

"Yours Respt., L. H. Church.

"Written by request."

In the summer of 1890, as has been said, a compromise was arranged between Mrs. Clark and Poly, Heilbron & Co., an essential condition of which was that defendant, Cheape, should acquire the Laguna de Taché Rancho; defendant, through Dr. Perrin, having previously secured an option for its purchase from Mrs. Clark. Accordingly, he did acquire it for the canal company for $780,000. A certain cash payment was made thereon, and a deed therefor was placed in escrow, to be delivered upon the making of the deferred payments. In December, 1890, defendant contracted to sell to a Mr. Menzies, of England, one-fourth of the capital stock of the canal company for $250,000; and in the early part of 1891 the agreement was changed to one-third of the stock, for $333,000. Fifty thousand dollars was paid by Menzies to defendant in cash, and $200,000 was agreed to be paid by him on the 1st of July, 1891. In May, 1891, the canal company authorized the issuance of bonds on its property to the extent of $1,000,000, the main purpose of which was to realize by their sale the money with which to pay for the Rancho Laguna de Taché. At that time the plaintiff was very sick, and had put his claim in the hands of his attorney, Mr. Firman Church, for the purpose of bringing suit thereon against the defendant. Since their disagreement, in the latter part of 1890, he had been demanding of defendant that the deferred payment be made in full, claiming that it was fully due, and threatening to bring suit therefor. Dr. Perrin went several times to plaintiff's house, to see him respecting

the matter. On one occasion, the defendant, Cheape, accompanied him; on another, Robert Perrin; and, on another, it is claimed on the part of the plaintiff that neither of them was along. On that occasion, as well as on the other occasions referred to, plaintiff says Dr. Perrin talked the matter over with him, and said that he ought not to bring suit; that, if he did, he would be kept out of his money a longer time; that the money was due and overdue; and that he felt as badly about the matter as plaintiff did. "But," continued the witness, "he says: 'If you bring the suit,—we are trying to bond this canal, and if you bring the suit, it will stop the bonding. We expect to get a million of money on the bonds, and we expect to pay you right out in full. But, if you go on with this suit, it will so cripple us and embarrass us that we cannot bond the canal, and consequently you won't get your pay.'" Plaintiff testified that, certain members of his family having come into the room during this conversation, and one of them (his daughter) having started to go out, Dr. Perrin said:

" 'Look here. I want you to stop. I want to repeat now,' says he, 'in the presence of your people. You are the heirs,' he says, 'will be the heirs, to your father's estate, and,' says he, 'if your father should die, I want you to know just exactly the situation.' He says: 'This money is due, due Mr. Church, and was due on the settlement of that quieting of that title on the Jeremiah Clark case, and,' he says, 'it is due, and ought to have been paid long ago, and if your father was to commence a suit, which he talks of doing, why he might not get his pay.' It would make Cheape mad. That he would never pay. That is, he said it would be ten years. He said he could put up counterclaims against me that would keep me out of it ten years; and he went through with his story. He says: 'Cheape and me has talked this matter all over between ourselves, and we are perfectly satisfied that the litigation is all off and ended. All that amounts to anything is ended, and was ended when the Jeremiah Clark case was settled.' I spoke then, and says I: 'Now, Mr. Perrin, you know what the agreement was between you and me. Do you feel perfectly satisfied that the suits are all ended?' 'Yes,' he says. 'I do.' He says: 'There is some little suits, but they don't amount to nothing.' He says: 'We have the land and the water. We can manage them all.' "

The substance of this testimony of the plaintiff is corroborated by that of his wife, his daughter, Mrs. Fanning, and his son, George F. Church. It is explicitly denied by Dr. Perrin, whose testimony in regard to that matter is, in effect, that what he said and agreed to was that if Menzies paid the money he had contracted to pay, of which he felt sure, then, and in that event, defendant would, as a compromise and settlement of plaintiff's claim, the amount of which was in dispute by reason of the plaintiff's refusal to continue the payment of the expenses of the litigation in which the canal company was engaged, pay plaintiff on the 1st of July, 1891, $60,000 in cash. This testimony on the part of Dr. Perrin is supported by that of defendant, Cheape, and of Robert Perrin, in respect to the conversations heard by them between plaintiff and Dr. Perrin in plaintiff's house, in which those witnesses say that on those occasions the expressed and distinct understanding was that $60,000 should be paid the plaintiff in money on the 1st of July if Menzies made the payment he had contracted to make, and then only as a compromise and full settlement of plaintiff's claim.

Firman Church testified on behalf of the plaintiff that in May or June, 1891, he met Dr. Perrin on the street in Fresno, and told him that plaintiff was urging him (the witness) to commence suit for the money claimed by plaintiff, and that Dr. Perrin said it was unnecessary. "We are going to pay Mr. M. J. Church sixty thousand dollars." That Capt. Cheape was standing a little way off, and Dr. Perrin called him, and said, "I want to say this before Captain Cheape." "Calls Captain Cheape up there," continued the witness, "and 'now,' says he, 'I want to say in your presence to Mr. Firman Church that we are going to pay Mr. M. J. Church sixty thousand dollars on this claim.'" Being asked by plaintiff's counsel the question, "This sixty thousand dollars, I believe you said, was to be on the demand?" the witness answered: "Well, since I think of it, Dr. Perrin said they were negotiating for the Laguna de Taché Rancho, and that matter would be closed up somewhere during the first days of July, and that, as soon as that was closed up, they would be ready to pay these sixty thousand dollars."

The testimony of the defendant, Cheape, is that he has no recollection whatever of having been called up by Dr. Perrin, or to have heard the conversation referred to by Mr. Firman Church. Both Dr. Perrin and Robert Perrin testify that the latter was present at the conversation that was had between Firman Church and Dr. Perrin, but that the conversation was not that $60,000 would be paid the plaintiff on account of his claim, but that, if Menzies made the payment on the purchase he had contracted to make, $60,000 would be paid to him in settlement of it.

In the sharp conflict of testimony, to which reference has been made, resort must be again had to corroborating circumstances, and to the probabilities of the case. In respect to the testimony of Mr. Firman Church, one strong circumstance tending to support the version given by the Perrins is that, at the time of the conversation with him, the only pending negotiation in regard to the Rancho Laguna de Taché was that pending with Menzies for the purchase by him of an interest in it, together with the other property of the canal company, on which he had agreed to pay $200,000 the 1st of July; so that it must have been that transaction to which Dr. Perrin referred when, according to the testimony of Firman Church, he told him: "They were negotiating for the Laguna de Taché Rancho, and that that matter would be closed up somewhere during the first days of July, and, as soon as that was closed up, they would be ready to pay the $60,000."

And in respect to the contention on the part of the plaintiff that Dr. Perrin said to him that he and defendant, Cheape, had agreed that all of the litigation in which the canal company was engaged was practically ended, and that the balance of the purchase price of the stock was due, it seems, apart from the denials of that testimony by the defendant and the Perrins, almost incredible, in view of the facts in regard to that litigation, that they could have agreed that the litigation was practically ended. Not a single one of the suits that were pending when the contract was entered into had been disposed of, or, so far as the record shows, has yet been disposed of,

except the suit brought by Poly, Heilbron & Co. against the canal company. Two of the other cases then pending. against the canal company have since been decided by the trial court adversely to its contentions, and are now pending on motions for new trial. Two of the others (those brought by Heinlen) are based upon a claim precisely similar in its nature to the suit brought by Poly, Heilbron & Co.; namely, that of a riparian proprietor, asserting the right to prevent the diversion of any of the water of Kings river. In view of these facts, it is in the highest sense improbable that defendant or Dr. Perrin agreed that the litigation was practically ended; and when to this is added the testimony of the defendant and of the Perrins that what was agreed to was that if the Menzies agreement was consummated, as was confidently counted on, and he should pay the money he agreed to pay the 1st of July, then, as a compromise of the dispute that existed between the parties here, defendant would pay plaintiff $60,000 in cash, I think there is no room for doubt that the agreement was as stated on the part of the defendant. Without regard, therefore, to the point made by counsel that the contract as testified to by plaintiff is at variance with the allegations of the complaint, there must be findings and judgment for defendant.